UNITED STATES of America, Appellee,

v.

David Isaac WALTZER, Appellant.

No. 1012, Docket 82–1015.

United States Court of Appeals,
Second Circuit.

Argued April 21, 1982.

Decided June 25, 1982.

Irving Anolik, New York City, for appellant.

Gregory J. Wallance, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. N. Y., Jane Simkin Smith, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before OAKES, CARDAMONE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

David I. Waltzer appeals from a judgment of conviction of the United States District Court, 528 F.Supp. 646, for the Eastern District of New York, Platt, *Judge*, after a jury trial, for violation of 21 U.S.C. § 841(a)(1) (1976) (possession with intent to distribute cocaine). He asserts as error Judge Platt's denial of a motion to suppress as evidence both his statements to Drug Enforcement Agency (DEA) officers and claim checks, airline tickets and money taken from his person as well as cocaine taken from his luggage. He argues in the alternative that the initial DEA investigatory stop should have triggered the warnings required under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

We affirm.

## BACKGROUND

The sequence of events leading to Waltzer's arrest began in the Ft. Lauderdale Airport. Waltzer was observed waiting at the Delta Airline Terminal by Broward County Sheriff James Carl. Carl noted behavior on Waltzer's part which drug investigators believe is common to drug couriers—extreme nervousness, fidgeting, and shaking—and which they say constitutes a reliable "profile."[1] Sheriff Carl approached the Delta ticket counter and overheard Waltzer identify himself as Walker and observed him purchase a one-way ticket to New York City on Delta flight 1052. After Waltzer left the ticket counter, Carl noted the claim numbers and identification labels of defendant's two pieces of luggage. He then contacted DEA officials at Kennedy International Airport in New York and informed them of his observations. Waltzer was neither questioned nor detained in Ft. Lauderdale.

DEA investigation and observation began as soon as Delta flight 1052 landed. A specially-trained dog named Kane was dispatched to the Delta package area to "sniff" the baggage as it was unloaded. According to the testimony,[2] Kane was capable of determining whether a particular piece of luggage contained narcotics and of alerting agents to the presence of drugs by biting and gnawing at the luggage. Kane had a perfect record—on each occasion his alerting of agents to a particular bag had led to the discovery of narcotics. Kane alerted the agents to the luggage described by Sheriff Carl.

Meanwhile, DEA Agent Terry Valentine was observing Waltzer. Upon disembarking, Waltzer left the gate area quickly, abruptly slowed his pace, looked left and right

---

1. Since elements of the "profile" caused nothing more than further observation of Waltzer, it was used merely as "an administrative tool of the police" in this case. *United States v. Berry*, 670 F.2d 583, 600 (5th Cir. Unit B 1982). It guided "law enforcement officers toward individuals on whom the officers should [have] focus[ed] their attention in order to determine whether there [was] a basis for a specific and articulable suspicion that the particular individual [was] smuggling drugs." *Id.* at 600, n.21.

2. We note that on appeal we view the facts in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

and then entered an adjoining men's room. After approximately two minutes, Waltzer left the men's room and walked at a normal pace toward a stairway leading to the baggage claim area. Immediately before the stairway, Waltzer made a sharp left turn and walked toward an exit. He passed through it and made a quick right back toward the stairway and the baggage claim area, but on the other side of a glass partition. He repeatedly looked to his right through the partition, at one point looking directly at Agent Valentine. Upon reaching the stairway, he looked to his left, walked slowly down the stairs, hesitated at the first baggage carousel, and then proceeded to the next. Again hesitating, he walked across the claim area to a public phone, looked at Valentine, then appeared to place a call.

Shortly thereafter, Waltzer made his way back toward the stairway from which he had come. He darted to the right of the stairway, ducked around a corner, returned to stare at Valentine for a third time and then went to make another phone call. After that call, he walked to the stairway for the third time and went up an adjacent escalator. Waltzer proceeded through the upper corridor away from the Delta terminal. Midway through the corridor, he abruptly turned around and again confronted Valentine who was only a short distance away. Waltzer turned and continued away from Delta toward the adjacent Northwest Airlines terminal area. Valentine gave up his observation of Waltzer and returned to the Delta baggage area.

Waltzer returned to the Delta baggage carousel. He retrieved the two bags which had been identified by the dog, and the trio of agents asked to speak to him. He agreed and the group walked over to a wall to avoid the flow of passengers.

A somewhat bizarre conversation ensued in response to the agents' questions. Waltzer denied having a baggage claim although he was holding one in his hand. He purported not to know why he was traveling under an assumed name. He stated that he was carrying $1,000 on his person so as to entertain relatives in Ft. Lauderdale with whom he had stayed. Finally, Waltzer indicated he was traveling alone and denied there were drugs in his bags. The agents asked Waltzer if he would consent to a search of his bags. He refused and, following that refusal, was arrested and given his *Miranda* rights. The entire conversation took about 10 minutes.

Subsequently, a search warrant was issued, and cocaine was discovered inside Waltzer's luggage. The claim check, airline tickets, cash, cocaine and his statements to the officers were used against him at trial.

## DISCUSSION

Waltzer claims that the initial stop and, therefore, all that flowed from it, was based on little more than a flimsy suspicion generated by overreliance upon the so-called courier profile. If so, this case might raise far more serious legal issues. *See Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); *United States v. Place*, 660 F.2d 44 (2d Cir. 1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 2901, 73 L.Ed.2d 1312 (1982). The DEA agents had more specific grounds to stop Waltzer than general similarities to the profile, however, for, unlike *Place*, the dog had designated luggage independently connected to him before he was stopped.

We regard the dog's designation of the luggage as itself establishing probable cause, enough for the arrest, more than enough for the stop. *Cf. United States v. Johnson*, 660 F.2d 21 (2d Cir. 1981); *United States v. Bronstein*, 521 F.2d 459 (2d Cir. 1975), *cert. denied*, 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976). The testimony indicated that the dog Kane had a record of 100 percent accuracy. Given that record of accuracy and the designation of luggage connected to Waltzer by independent evidence, the DEA agents did not have to stand helplessly by while Waltzer claimed the luggage and left the airport.

Canine identification is a non-intrusive, discriminating and, in cases such as Kane, reliable method of identifying pack-

ages containing narcotics. Its use is considerably less offensive to Fourth Amendment values than other methods of policing the transportation of drugs. In avoiding the subjectivity of some aspects of the profile— e.g., identification of nervous or evasive behavior—and the overbreadth of others— e.g., getting off an airplane first or traveling from a "source city"—it abjures reliance upon those factors which have led to recent expressions of judicial skepticism. *See Reid, supra; Place, supra; United States v. Morin*, 665 F.2d 765 (5th Cir. 1982). We see no reason to encourage reliance upon the so-called profile when more reliable, less intrusive, means of establishing probable cause exist.[3] Where designation by a dog with a record of accuracy occurs, therefore, we hold that probable cause has been established as to the person possessing the luggage.[4]

■ We reaffirm, moreover, our prior rulings that canine sniffing is neither a search nor seizure for purposes of the Fourth Amendment. *Johnson, supra; Bronstein, supra.* The Ninth Circuit has recently ruled otherwise and stated that the reasoning of our prior cases "seems to have [been] rejected" by the Supreme Court. *United States v. Beale*, 674 F.2d 1327, 1331 (9th Cir. 1982). We disagree. The cases cited, *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), stand for the proposition that individuals have a privacy interest in their personal luggage. The issue, however, is not whether such a privacy interest exists but whether canine sniffing intrudes on that interest. We again hold it does not. Odor is extrinsic to the luggage,

which is not opened, and the sniffing discloses only contraband, not other items in the bags. The owner is not subjected to the inconvenience and possible humiliation entailed in other less discriminate and more intrusive methods. Sniffing results in virtually no annoyance and rarely even contact with the owner of the bags, unless the scent is positive, in which case, as we hold, probable cause has been established. The only privacy intruded on is thus the secret possession of contraband.

Waltzer also claims that the initial stop constituted an arrest and thus triggered the need to advise him of his *Miranda* rights. We reject the claim.

■ First, the existence of probable cause does not by itself compel officers to forego an investigatory stop and make an arrest. As the Court recognized in *Hoffa v. United States*, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966)

There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause....

■ Second, whether an initial stop constitutes an arrest depends upon the degree of intrusion and assertion of custody by the officers. No court has held that a stop such as the one before us requires *Miranda* warnings at the very outset. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20

---

**3.** Elements of the profile arguably support the probable cause finding in this case. The government identifies these as: 1) nervous behavior in Ft. Lauderdale, 2) Waltzer's leaving the plane first, 3) purchase of a one-way ticket with cash, 4) travel from a "source city," 5) use of an assumed name, 6) Waltzer's evasive behavior at Kennedy, and 7) his odd statements while conversing with the DEA agents. This profile evidence is supportive, particularly evidence of a reluctance to claim baggage connected to him by independent proof, but the

canine identification weighs so heavily in comparison that we prefer to rely on that alone rather than enter the debate over use of the profile as more than a device triggering further observation of a particular individual.

**4.** The fact that presently "clean" luggage recently used to carry drugs might conceivably be identified is not significant so far as establishing probable cause is concerned. *United States v. Johnson, supra.*

L.Ed.2d 889 (1968). The agents simply asked to speak to Waltzer. He agreed and the conversation took place on the spot in a public, well-traveled area of the airport. There was thus no assertion of custody or restriction of mobility. *Compare United States v. Mendenhall*, 446 U.S. 544, 574–575, 100 S.Ct. 1870, 1887–88, 64 L.Ed.2d 497 (1980) (White, J. dissenting). That we know from 20/20 hindsight the DEA agents would have arrested him had he attempted to leave, does not alter the character of the stop. The subjective, future intentions of the officers do not transform an investigatory stop into an arrest. *United States v. Hall*, 421 F.2d 540 (2d Cir. 1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970).

Affirmed.

OAKES, Circuit Judge (concurring):

I have previously made clear my regulatory-view position in regard to the so-called drug courier "profile." *United States v. Place*, 660 F.2d 44, 53 (2d Cir. 1981) (concurring opinion), *cert. granted*, —— U.S. ——, 102 S.Ct. 2901, 73 L.Ed.2d 1312 (1982); *United States v. Vasquez*, 612 F.2d 1338, 1352 (2d Cir. 1979) (dissenting opinion), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980); *cf. United States v. Barbera*, 514 F.2d 294 (2d Cir. 1975) (border stop case). While I adhere to that position, the majority's non-reliance on the profile but reliance on the able, canny canine, Kane, with the perfect record—all hits and no misses—accords with the precedents of this court and common sense. I therefore join happily in Judge Winter's opinion as well as the judgment.